**STATE**

v.

**Francisco TORRES.**

No. 2001–54–C.A.

Supreme Court of Rhode Island.

March 26, 2004.

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLAHERTY, Justice.

In this appeal, we are called upon to determine whether the intentional exclusion of the defendant's family members from the courtroom during jury selection violated the defendant's right to a public trial. Because we believe the trial justice's actions impermissibly and adversely impacted the defendant's rights under the Sixth Amendment to the United States Constitution, we sustain his appeal, reverse the judgment of the Superior Court, and remand this matter for a new trial.

In the early morning hours of August 14, 1999 at Club Fusion, a Providence night spot, Debbi Vidot was finishing her shift as a dancer at the club. Vidot was the girlfriend of the defendant, Francisco Torres, with whom she shared both a home and three children. Earlier in the evening, while dancing in a white, "skin-tight" outfit and sporting a white cowboy hat, she apparently attracted the attention of club patron Luis Velez. Just before closing, Vidot screamed out "somebody grabbed my ass," identifying Velez as the perpetrator of this offensive behavior. A brief disturbance ensued, concluding with the eviction of Velez by the club's bouncers.

Stewart Stallings had arrived at Club Fusion at 9 p.m., after having ingested a dose of the street drug "ecstasy" a half-

hour earlier. When the club closed, Stallings filed out of the club with his friends. Once outside, he found himself in a group of about twenty people, including Velez, with whom he was acquainted. This group congregated on the sidewalk near Club Fusion, listening and dancing to music. Stallings, who was aware of the commotion in the club and had seen Velez being escorted outside, began a conversation with Velez concerning the latter's involvement in what had transpired earlier.

While Stallings and Velez were talking, Dustin Moore, who had just finished his shift as a cook at Snookers, an establishment located next door to Club Fusion, exited onto the sidewalk. At the same time, a white Nissan Maxima with tinted windows drove ominously slow down Clifford Street in the direction of the assembled group. The front passenger-side window was rolled down just enough for the passenger to peer out. When the Maxima reached Stallings and Velez, someone inside the car ordered the driver to stop. The passenger then sprang out of the vehicle, brandishing a silver revolver. At a distance of about five or six feet from his target, the gunman aimed at Velez's chest and fired two shots. Velez and Stallings immediately fled in the direction of Club Fusion, while Moore, caught in the gunman's fire, spun around and attempted to return to Snookers while the gunman fired off about four more rounds. When the smoke cleared, Moore had been shot once in each hand, Stallings had been shot in the left calf, and Velez had been shot in the upper arm and left hand.

On August 27, 1999, Stallings provided a statement to Providence police and, after being shown a six-person photo array, positively identified defendant as the gunman. The defendant subsequently was charged by criminal information with three counts of assault with intent to murder, in violation of G.L.1956 § 11–5–1, and one count of carrying a revolver without a license, in violation of G.L.1956 § 11–47–8(a).

A jury trial commenced on July 31, 2000. Before the proceedings began, the sheriff asked defendant's two sisters to leave the courtroom because seating space was required for the jury panel. After defendant's family members left the courtroom, defense counsel immediately requested a sidebar conference, during which he informed the trial justice of the sheriff's actions.[1] He then requested that the trial justice accommodate defendant's sisters during jury selection so that they could be present in the courtroom. The trial justice rejected this request, noting the small size of the courtroom, and promised that when room did become available, he would allow them to "come in." The defendant's sisters were not permitted to re-enter the courtroom until jury selection and *voir dire* had been completed.[2]

After the jury was impaneled, defense counsel moved that the jury be discharged, arguing that it had not been selected in a public forum. The trial justice denied this motion and the trial proceeded. At the

1. Also during this sidebar conference, the state moved to amend the three charges of assault with intent to murder to assault with a dangerous weapon. The defendant did not object.

2. In its memorandum, the state suggested that defendant's sisters might have reentered the courtroom at some point during the jury-selection process, after noting that the record was lacking with respect to that particular detail. Immediately prior to oral arguments, defendant submitted an affidavit of his trial counsel, which testified to the fact that defendant's family members were not permitted to reenter the courtroom until the completion of jury selection. At oral argument, the state accepted as true the affidavit statements of defendant's trial counsel.

close of the state's case, the trial justice granted defendant's motion for judgment of acquittal on the count alleging carrying a revolver without a license. On August 2, 2000, the jury returned verdicts of guilty on the three remaining counts, and the trial justice denied defendant's motion for a new trial on August 4, 2000. On October 24, 2000, the trial justice sentenced defendant to fifteen years on each count, with five years to serve on each, running consecutively.

On appeal, defendant advances several arguments, including a claim that his constitutional right to a public trial was infringed. The defendant argues that the eviction of his two sisters from the courtroom immediately prior to the jury-selection proceedings violated his constitutional right to a public trial, as guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. It is defendant's contention that the trial justice's reasons for not permitting his sisters to observe the proceedings were insufficient to warrant depriving him of his right to a public trial. Moreover, defendant submits that he is entitled to relief for a violation of this right without the need to demonstrate specific prejudice.

The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution both provide that accused persons in criminal prosecutions shall enjoy the right to a public trial. The public-trial requirement benefits the defendant, discourages perjury, and ensures that judges, lawyers, and witnesses perform their duties responsibly. *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *see also Santos v. Brown,* 596 F.Supp. 214, 217 (D.R.I.1984). The scope of a defendant's Sixth Amendment right to a public trial has evolved most recently from United States Supreme Court cases interpreting the press and public's First Amendment right to a public trial. In *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Supreme Court held that the press and public's right of access to criminal trials under the First Amendment extends to the *voir dire* examination of potential jurors. That case also set forth a test to determine whether challenged closures were violative of that right.[3] The Court soon thereafter recognized that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller,* 467 U.S. at 46, 104 S.Ct. 2210. By thus equating these separate constitutional rights, the Court essentially determined that "the public trial aspect of the [S]ixth [A]mendment applies to the *voir dire* and the individual jury selection process." *People v. Taylor,* 244 Ill.App.3d 460, 183 Ill.Dec. 891, 612 N.E.2d 543, 546 (1993).

An accused's right to a public trial under the Sixth Amendment, however, is not absolute. *Santos,* 596 F.Supp. at 217. The *Waller* Court considered the extent of a defendant's right to insist upon a public trial and held that "any closure of a suppression hearing over the objections

---

**3.** The *Press–Enterprise* Court enunciated the following inquiry:

"The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).

of the accused must meet the tests set out in *Press–Enterprise* and its predecessors," which it framed as follows:

> "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 47–48, 104 S.Ct. 2210.[4]

The *Waller* analysis applies as well to the closure of jury-selection proceedings over an accused's objections. *See, e.g., Taylor*, 183 Ill.Dec. 891, 612 N.E.2d at 548; *Watters v. State*, 328 Md. 38, 612 A.2d 1288, 1291 (1992); *State v. Cuccio*, 350 N.J.Super. 248, 794 A.2d 880, 890 (App.Div.2002).

■ "The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom." *United States v. Al–Smadi*, 15 F.3d 153, 154 (10th Cir.1994). "[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *In re Oliver*, 333 U.S. 257, 271–72, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Therefore, the barring of a defendant's family from the courtroom during the jury-selection process has been held to violate the Sixth Amendment, requiring a new trial. *See, e.g., People v. Willis*, 274 Ill. App.3d 551, 211 Ill.Dec. 109, 654 N.E.2d

571, 574 (1995); *Taylor*, 183 Ill.Dec. 891, 612 N.E.2d at 549; *Watters*, 612 A.2d at 1291; *Cuccio*, 794 A.2d at 892.

Although the record here does not offer a complete picture of exactly who was in the courtroom and what transpired, we do know that before jury selection and *voir dire*, defense counsel requested a sidebar conference, in which he informed the trial justice:

> "[b]efore these proceedings began your Sheriff asked my defendant's two sisters to leave the courtroom because the room was required * * * for the jury. I notice that there are now two seats empty, plus a number of seats at the State's table, as well as one seat, at least, near me. I'm asking that you make available room so that the defendant's sisters can be present during this stage of the proceedings."

The trial justice responded:

> "the only chair I see available is one in the back of the courtroom way in the corner next to a juror, and one in the jury box. This is a very cramped courtroom. As soon as room is available I will be happy to have them come in. There is no room at the moment."

Jury selection then proceeded. After the jury was impaneled and excused for a brief recess, defendant moved that the jury be discharged because it was not selected in a public forum. Defense counsel noted that "[t]here were a number of unused chairs during the jury selection process that could have accommodated the defendant's

---

4. The defendant expends some effort in his memorandum referring to the criteria set forth in *State v. Cianci*, 496 A.2d 139 (R.I. 1985) and *Providence Journal Co. v. Superior Court*, 593 A.2d 446 (R.I.1991). The four-part inquiry enunciated in those cases before any closure can be justified, however, is not applicable here. In *Cianci* and *Providence Journal Co.*, the petitioners were media representa-

tives who intervened to argue that their First Amendment right to a public trial had been violated. In those cases, this Court merely balanced the competing interests of the defendants' Sixth Amendment right to a fair trial, not their Sixth Amendment right to a public trial, against the First Amendment right of the press and public to have access to criminal proceedings.

sisters." He then acknowledged that the trial justice "indicated they were permitted to come in sometime later and they're now present in the courtroom, but it seems to me that the Constitution does not limit the extent of a defendant's trial rights." The trial justice responded to defendant's motion as follows:

"The confines of this room limits the number of chairs, seats available. We'll remain in this courtroom. I understand it has its advantages and disadvantages. Jury selection is one of the disadvantages, because we have a small spectator area. It only seats about twenty, twenty-five people. If I could find a waay [*sic*] to get more chairs in here, I would. The request is denied."

The trial justice's refusal to admit defendant's two sisters into the courtroom during the jury-selection proceedings was an affirmative act of closure, implicating defendant's Sixth Amendment right to a public trial. His brief references to the practical challenges of such a small courtroom and the limited number of available seats were not sufficient to demonstrate an overriding interest to remain in such a posture to the exclusion of these family members. We cannot discern from the record if any members of the public were present during the proceedings, or if they, too, were not allowed in the courtroom. Nonetheless, nothing in the record indicates to us that the trial justice was aware of his obligation to keep the trial public. While accommodating the prospective jurors and parties already present in his small courtroom, he clearly did not accommodate defendant's right to a public trial.

More significantly, the trial justice failed to recognize that defendant was entitled to have his family members present during the selection of the jury that would be determining his fate. The defendant specifically requested that his sisters be present in the courtroom, but the trial justice rejected this request because the courtroom was "cramped." His promise to allow them admission when space became available was woefully inadequate; no effort was made to ensure that defendant's sisters could be present, even though there were at least two empty seats available. Instead, it appears that these seats remained vacant despite the presence of the family members in the courthouse and their desire to attend the seating of the jury. Under any circumstances, a trial justice must be particularly sensitive to a criminal defendant's right to have members of his or her family present during trial proceedings; endeavors toward that end were absent here.

Although it is not absolutely certain from the record whether the entire public was barred from the proceedings, there is a clear implication that by closing the proceedings to defendant's family, the trial justice removed the only members of the public who sought access to the trial. The trial justice failed to acknowledge the public-trial requirement of the state and federal constitutions by considering alternatives to closing the jury-selection process to defendant's family. He summarily dismissed the idea of moving to a larger courtroom, at least for jury selection and *voir dire,* by announcing that "[w]e'll remain in this courtroom." We recognize our previous holding that a trial justice's refusal to conduct a trial in a larger courtroom did not deny the accused his right to a public trial, absent any indication that the public actually was excluded. *See State v. Lerner,* 112 R.I. 62, 91, 308 A.2d 324, 342 (1973). Here, however, the record clearly establishes that members of the public, indeed, members of defendant's family, actually were denied the opportunity to observe a critical segment of the trial. Furthermore, the trial justice neglected to consid-

er any other alternatives to this closure, such as limiting the size of the jury pool, allowing the family members to stand while they observed the proceedings, or requesting a larger courtroom. This Court cannot countenance a situation where defendant's constitutional right to a public trial is leveraged for the trial court's logistical convenience.

The facts in this matter are similar to those that the Maryland Court of Appeals confronted in *Watters*. In *Watters*, 612 A.2d at 1289, a deputy sheriff evicted members of the defendant's family, and others, from the courtroom during *voir dire* and jury selection. After the jury had been selected, defense counsel moved for a mistrial, asserting that his client had been deprived of his right to a public trial. *Id.* at 1290. At a hearing on the motion, the deputy sheriff testified that he had ordered the expulsion because the courtroom would not accommodate all of the people who sought access; this despite his concession that there were "some seats" available. *Id.* The trial judge denied the motion for mistrial, stating that the closure "was done as a matter of court security because of the crowded conditions of the courtroom, and it is not denying him his right to a public trial." *Id.* On appeal, the *Watters* court held that the courtroom closure violated the defendant's Sixth Amendment right, stating:

"The circumstances at this trial did not present a compelling need for excluding members of the defendant's family as well as the press and the public. The record, although lacking in desirable particulars, establishes that there were seats available during the voir dire and the jury selection.

"Moreover, even if the State could show that under the circumstances then prevailing the government had a legitimate interest in preventing overcrowd-ing, it could not show that the exclusion of all persons was a narrowly tailored means of protecting that interest. There was no effort to ensure that petitioner's family could be present while the jury was selected, nor was there apparently any effort to admit representatives of the press. There was not even an attempt to fill the remaining seats impartially. Rather, after the venirepersons and witnesses had taken their places, the empty seats were left vacant, notwithstanding the early arrival of the defendant's family members and their request for admission." *Id.* at 1291.

Under the circumstances presented in the instant record, we find that the trial justice failed to establish an overriding need to expel defendant's sisters. Even if the courtroom were limited in size to a degree that seating was inadequate for jurors, there is no support for an argument that further crowding justified subjugating defendant's fundamental constitutional right to a public trial and to have family members present. On the contrary, the record reveals that the courtroom was not completely filled and that his sisters could have been seated without displacing any other individuals whose presence was necessary. Thus, the trial justice's order to keep the courtroom closed to defendant's family was broader than necessary. If the trial justice was concerned that having defendant's sisters seated in the midst of the jurors might influence their potential service, he did not articulate it. Indeed, he expressed no other interest other than the physical restrictions of the courtroom. Therefore, we hold that the trial justice violated defendant's Sixth Amendment right to a public trial.

■ The state argues that the expulsion of defendant's sisters was *de minimus* and therefore does not mandate an automatic

reversal of his convictions. Relying on *Waller* and *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), defendant responds that because he is not required to prove specific prejudice to obtain relief for a violation of his public-trial right, his convictions should be vacated and the case remanded for a new trial. We agree.

■ The United States Supreme Court has noted that violations of the Sixth Amendment's public-trial provision are not subject to a "harmless error" analysis. *Fulminante*, 499 U.S. at 309, 111 S.Ct. 1246; *Waller*, 467 U.S. at 49 n. 9, 104 S.Ct. 2210. Therefore, "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Waller*, 467 U.S. at 49, 104 S.Ct. 2210; *but see Peterson v. Williams*, 85 F.3d 39, 44 n. 8 (2d Cir.1996) ("it is also possible that when a closure is entirely accidental, the Sixth Amendment would only be deemed violated when prejudice is shown"). Furthermore, the remedy for such a violation "should be appropriate to the violation." *Waller*, 467 U.S. at 50, 104 S.Ct. 2210.

■ We recognize as well, however, that the Sixth Amendment is not violated every time the public is excluded from a courtroom. *Peterson*, 85 F.3d at 40; *see also Al–Smadi*, 15 F.3d at 154–55 ("[t]he brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment"). An unjustified closure may, on its facts, be so trivial as not to violate the Sixth Amendment guarantee. *Peterson*, 85 F.3d at 42. A triviality standard is "very different from a harmless error inquiry" and "looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant * * * of the protections conferred by the Sixth

Amendment." *Id.; see also Braun v. Powell*, 227 F.3d 908, 918–19 (7th Cir.2000) (applying *Peterson* analysis in holding that the exclusion of one person who was not a relative or friend of the defendant did not violate the Sixth Amendment, despite the fact that the exclusion was permanent and intentional).

The closure here extended through the entire jury selection and *voir dire*, which apparently occupied an entire morning of the trial proceedings. It was neither brief nor inadvertent, but was an intentional restriction of members of the defendant's family after he had requested their admission. In addition to depriving the defendant of his right to have members of his family present, the trial justice's action deprived the defendant of the inherent protections of the Sixth Amendment, specifically, the assurance that those individuals participating in his trial perform their respective duties honestly, fairly, and responsibly. A violation this severe cannot be considered *de minimus*. Rather, it has constitutional significance that presumes specific prejudice to the defendant and therefore requires appropriate relief. Under these circumstances, the appropriate relief is the granting of a new trial.

We hold that the defendant's Sixth Amendment right to a public trial was violated when members of his family were removed from the courtroom during the jury-selection process. Therefore, we remand the case for a new trial. Because of our determination of the defendant's Sixth Amendment argument, we need not consider the other arguments he advances.